AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



| | |
|---|---|
| United States of America | |
| v. | |
| TRISHA DENISE MEYER, and ABDUL RAHMAN, | Case No.  5:22-mj-00584-DUTY |
| Defendants | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about and between the dates of April 17, 2021, and May 4, 2021, in the county of Riverside in the Central

District of California, and elsewhere, the defendants violated:

Code Section                                                Offense Description

**Please see Attachment A for detailed
description of offenses and code sections.**

This criminal complaint is based on these facts:

**Please see attached affidavit.**

☒ Continued on the attached sheet.

_____
Complainant's signature

Ed Newcomer, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _9/15/2022_____          _____
                                                                      Judge's signature

City and state:  Los Angeles, California          Hon. Jacqueline Chooljian, U.S. Magistrate Judge
                                                                      Printed name and title

AUSA: Joseph O. Johns (213-894-4536/joseph.johns@usdoj.gov)

**ATTACHMENT A TO CRIMINAL COMPLAINT**

**DESCRIPTION OF CRIMINAL OFFENSES**

COUNT ONE

(Interstate Transportation of an Endangered Species in the Course of Commercial Activity)

[16 U.S.C. §§ 1538(a)(1)(E), 1540(b)(1); 18 U.S.C. § 2(b)]

Between on or about April 17, 2021, and on or about May 4, 2021, in Riverside County, within the Central District of California, and elsewhere, defendants TRISHA DENISE MEYER and ABDUL RAHMAN, also known as "Manny Rahman," knowingly delivered, received, transported, and shipped, and caused the delivery, receipt, transportation, and shipment, in interstate commerce, by any means whatsoever and in the course of a commercial activity, an endangered wildlife species, namely, a live jaguar cub (*Panthera onca*).

COUNT TWO

(Interstate Sale of an Endangered Species)

[16 U.S.C. §§ 1538(a)(1)(F), 1540(b)(1)]

Between on or about April 17, 2021, and on or about May 4, 2021, in Riverside County, within the Central District of California, and elsewhere, defendant TRISHA DENISE MEYER knowingly sold and offered to sale in interstate commerce an endangered wildlife species, namely, a live jaguar cub (*Panthera onca*).

COUNT THREE

(Trafficking Prohibited Wildlife Species)

[16 U.S.C. §§ 1538(a)(1)(E), (F), 3372(a)(2)(C), 3373(d)(1)(B);
18 U.S.C. § 2(b)]

Between on or about April 17, 2021, and on or about May 4, 2021, in Riverside County, within the Central District of California, and elsewhere, defendants TRISHA DENISE MEYER and ABDUL RAHMAN, also known as "Manny Rahman," knowingly transported, sold, received, acquired, and purchased in interstate commerce a prohibited wildlife species, namely, a live jaguar cub (*Panthera onca*).  During the commission of this offense, defendants TRISHA DENISE MEYER and ABDUL RAHMAN knowingly engaged in conduct that involved the sale and purchase of, offer for sale and purchase of, and intent to sell and purchase wildlife, namely, a live jaguar cub (Panthera onca), with a market value in excess of $350.00, knowing that the wildlife was transported and sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation.

**AFFIDAVIT**

I, Ed Newcomer, being duly sworn, declare and state as follows:

**I.  INTRODUCTION**

1.   I am a Special Agent of the United States Department of the Interior, Fish and Wildlife Service ("FWS") assigned to the Torrance, California field office. I have been employed by the FWS as a Special Agent since September 2002. During my employment with FWS I have conducted and participated in numerous investigations pertaining to violations of federal and state wildlife laws. I am admitted to practice law in the state of Washington and in the state of Colorado. Prior to joining the FWS as a Special Agent, I served as a hearing officer for the Colorado Department of Revenue between 2000 and 2002, as an Assistant Attorney General for the state of Colorado between 1999 and 2000, as an Assistant Attorney General for the state of Washington between 1994 to 1999, and as a private attorney in Washington prior to 1994.

**II. PURPOSE OF AFFIDAVIT**

2.   This affidavit is made in support of a criminal complaint against Trisha Denise MEYER and Abdul RAHMAN, and an arrest warrant for, Trisha Denise MEYER, for the following wildlife trafficking offenses: (1) interstate transportation of an endangered species in the course of commercial activity, a Class A misdemeanor, in violation of 16 U.S.C. §§ 1538(a)(1)(E), 1540(b)(1) and 18 U.S.C. § 2(b); (2) interstate sale of an endangered species, a Class A misdemeanor, in violation of 16 U.S.C. §§ 1538(a)(1)(F) and 1540(b)(1); and (3) trafficking

1

prohibited wildlife species, a felony, in violation of 16 U.S.C. §§ 1538(a)(1)(E), (F), 3372(a)(2)(C), 3373(d)(1)(B), and 18 U.S.C. § 2(b).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal charges and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III.  THE LEGAL BACKGROUND

**A.    The Endangered Species Act**

4.    The Endangered Species Act ("ESA") was enacted to provide a program for the conservation of endangered species and threatened species. (See 16 U.S.C. §§ 1531, et seq.) The ESA is administered and enforced by the United States Department of the Interior.

5.    Under the ESA, the term "endangered species" includes any species which is in danger of extinction throughout all or a significant portion of its range. The ESA sets forth a process by which it is determined whether any species is endangered. All species of wildlife determined to be endangered are listed at 50 C.F.R. § 17.11.

6.    All jaguars (<u>Panthera onca</u>) were listed by the Secretary of the Interior as endangered in 1972. The jaguar was on the list of endangered species in 2021 and remains on the list of endangered species as of the date of this complaint. (<u>See</u> 50 C.F.R. § 17.11).

7.    The ESA provides that it is unlawful for any person subject to the jurisdiction of the United States to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. (16 U.S.C. §§ 1538(a)(1)(E) and 1540(b)(1)). Any violation of Section 1538(a)(1)(E) is a Class A misdemeanor offense.

8.    The ESA also provides that it is unlawful for any person subject to the jurisdiction of the United States to knowingly sell or offer for sale in interstate or foreign commerce any endangered species. (16 U.S.C. §§ 1538(a)(1)(F) and 1540(b)(1)). Any violation of Section 1538(a)(1)(F) is a Class A misdemeanor offense.

**B.    The Lacey Act**

9.    The Lacey Act of 1900 is a federal conservation law that, among other things, prohibits the trade or trafficking in wildlife, fish, and plants that have been illegally taken, possessed, transported, or sold in violation of state law, federal law, foreign law, and international treaties. (<u>See</u> 16 U.S.C. §§ 3371, <u>et seq</u>.)

10.    The Lacey Act provides that it is unlawful for any person to transport, sell, receive, acquire, or purchase in

interstate or foreign commerce any prohibited wildlife species. (16 U.S.C. § 3372(a)(2)(C)).

11.   The Lacey Act defines the term "prohibited wildlife species" as "any live species of lion, tiger, leopard, cheetah, jaguar, or cougar or any hybrid of such species." (16 U.S.C. § 3371(g)).

12.   The Lacey Act further provides that any person who violates Section 3372(a)(2)(C), "by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both." (See 16 U.S.C. 3373(d)(1)(B)).

### IV. SUMMARY OF PROBABLE CAUSE

13.   Between approximately April 17 and September 17, 2021, a live jaguar cub was sold in interstate commerce by Trisha Denise MEYER ("MEYER") of Houston, TX, to Abdul RAHMAN ("RAHMAN") of Murrieta, CA for approximately $30,000. The jaguar cub was then transported from MEYER in Texas to RAHMAN in California for an additional fee. Knowing that the jaguar had been unlawfully sold and transported to him, RAHMAN later sold the jaguar to another individual, named H.G., of Riverside, CA. On September 17, 2021, the jaguar was transported from Riverside, CA to Alpine, CA, where it was abandoned after

4

business hours on the doorstep of a facility known as Lions, Tigers, and Bears.

## V. STATEMENT OF PROBABLE CAUSE

14.    On approximately October 21, 2021, I spoke with Wildlife Officer ("WO") Austin Smith of the California Department of Fish and Wildlife ("CDFW"). WO Smith told me that on September 17, 2021, at approximately 9:50 p.m., two unknown subjects arrived at an animal rescue facility known as Lions, Tigers, and Bears in Alpine, CA, after the facility was closed, and abandoned a live jaguar near the entrance to the facility. The event was captured on security cameras, and I later viewed the video and saw what appeared to be a live jaguar inside the cage dropped by the unknown subjects.   (A photograph of the abandoned jaguar is attached to this affidavit as Exhibit 1).

15.    On October 28, 2021, I spoke with B.B. at Lions, Tigers, and Bears who told me that the live jaguar dropped off on September 17, 2021, was a male. In addition, B.B. told me that some of her staff located Instagram posts of individuals posting videos of themselves posing with a live jaguar cub. B.B. told me that she compared the spot and whisker patterns of the jaguar in the Instagram videos with the spot and whisker patterns on the live jaguar dropped at the facility on September 17, 2021, and believed they matched. Through my training and experience, I know that the spot and whisker patterns on individual jaguars are unique and can be used in scientific research to definitively identify individual jaguars.

16.    Also on October 28, 2021, I spoke to C.D., who is an employee or volunteer at Lions, Tigers, and Bears. C.D. told me that she personally observed videos posted on the Instagram accounts "aXXXXXXXXXi" and "aXXXXXXXXXXXi" that depicted the live jaguar.[1] She forwarded those videos to me, and I recognized that the animal depicted in the videos was a live jaguar cub. I later confirmed that these two Instagram accounts belong to an individual named A.G., and his wife, who reside in Riverside, CA.

17.    Between October 28 and November 5, 2021, I learned that A.G. owned two homes in the Southern District of California; one located at 1XXX2 Lakepointe Drive in Riverside, CA and another in Corona, CA. It was my understanding from various databases that A.G. and his wife were using the Corona address as their primary residence.

18.    Using images posted on RedFin.com, an online real estate listing service, I located interior photographs of the home located at 1XXX2 Lakepointe Drive, as they appeared when the home was most likely sold to A.G. prior to 2021. I compared those photographs to what I could see in the background of the Instagram jaguar cub videos from the accounts "aXXXXXXXXXi" and "aXXXXXXXXXXXi" and I noticed numerous similar or identical characteristics such as floor type, trim style, interior layout of the house, and paint colors.

---

[1] Where appropriate, your affiant/complainant has redacted or abbreviated witness/subject names and social media account names and descriptors to protect personal identification information of individuals not charged in this complaint.

19. On November 5, 2021, I attempted to contact people living in the area around 1XXX2 Lakepointe Drive in Riverside, CA. While conducting those interviews, I encountered an individual named, H.G., standing in the driveway at 1XXX2 Lakepointe Drive. I identified myself to H.G. and he agreed to talk to me. He told me that he and his girlfriend/wife were renting the house from A.G. and had lived there for approximately four months. H.G. denied any knowledge of a jaguar and denied that he'd ever seen one or that one had ever been at the house while he was living there.

20. Between October 29 and November 9, 2021, I collected photographs and videos of the jaguar posted on A.G.'s Instagram account. I also collected photographs of the jaguar at Lions, Tigers, and Bears. I sent those photos and video frames to Dr. Mathias Tobler at the San Diego Zoo Wildlife Alliance. Dr. Tobler is a scientist who studies jaguars and uses spot and whisker pattern comparisons to identify individual animals in the wild as part of his research. On November 10, 2021, Dr. Tobler told me that the jaguar depicted in the Instagram videos and photos from the "aXXXXXXXXXi" and "aXXXXXXXXXXXi" accounts is the same jaguar currently held at Lions, Tigers, and Bears.

21. On January 25, 2022, WO Smith and I interviewed A.G. in the presence of his attorney. During the interview, A.G. told us the following:

a. He owns the home at 1XXX2 Lakepointe Drive in Riverside and that he has been renting the house to H.G. since January 2021.

7

      b.   The jaguar seen in the Instagram videos posted by A.G. and his wife belonged to H.G. A.G. and his wife saw the jaguar at H.G.'s rented house at 1XXX2 Lakepointe Drive on several occasions and took photos and videos with the jaguar and later posted them on their Instagram accounts. He denied that he ever owned the jaguar.

      c.   He believed that H.G. purchased the jaguar from another person for approximately $20,000.

      d.   He believes the previous owner of the jaguar was a woman he identified as "OXXXa," who I later identified as O.B. of Irvine, CA. He identified O.B.'s Instagram account as "_oXXXa_".

      e.   After the jaguar grew too large, H.G. planned to kill it but a friend of H.G.'s named R.A. convinced him to turn it over to a sanctuary.

      f.   R.A. and another person drove the jaguar to Lions, Tigers, and Bears on September 17, 2021, after the facility was closed and the staff were gone for the day, and left it at the facility's doorstep.

   22.   On approximately January 25, 2022, I viewed the Instagram account for user "_oXXXa_" and the TikTok account for user "_oXXXa_" and found numerous photographs and videos of a woman posing with a young jaguar cub. Using California Department of Motor Vehicle drivers' license records, I identified the woman in the videos and photos as O.B. I also observed that the cub in the photographs and videos on O.B.'s

Instagram and TikTok accounts was noticeably younger than the jaguar cub in the videos posted by A.G. and his wife.

23.   I later sent photographs and frames from O.B.'s Instagram and TikTok accounts to Dr. Tobler at the San Diego Zoo and he confirmed that the jaguar cub depicted on O.B.'s accounts is the same jaguar depicted in Instagram posts by A.G. and his wife and the same jaguar currently in the custody of Lions, Tigers, and Bears.

24.   On March 20, 2022, H.G. was arrested on outstanding felony warrants from the State of Texas and the State of Arizona unrelated to this investigation. Upon his arrest, and after waiving his *Miranda* rights, I asked H.G. questions about the jaguar. During his interview, H.G. told me the following:

a.   He repeatedly denied that he ever owned a jaguar but, instead, said that it belonged to a "friend of a friend" who would occasionally bring it to the house H.G. was renting at 1XXX2 Lakepointe Drive in Riverside, CA.

b.   It was during those occasions when his "friend of a friend" brought the jaguar that he and others would take photos and videos of themselves with the jaguar.

c.   He did not know the name of the "friend of a friend" who owned the jaguar but described him as an "Indian guy" and "like from Saudi Arabia."

25.   Later, on March 20, 2022, while at the Riverside County Jail, H.G. told me that he believes that a "woman from Texas" originally owned the jaguar but he does not know how the jaguar got from Texas to California.

26. Following H.G.'s arrest on March 20, 2022, WO Smith obtained a search warrant for items stored on the Cloud account associated with H.G.'s iPhone. WO Smith shared with me numerous photographs and videos of the live jaguar being held and played with by H.G. over many months and consecutive days. Those photographs and videos appear to have been taken at 1XXX2 Lakepointe Drive in Riverside, CA.

27. On March 31 and April 11, 2022, I interviewed the woman named O.B. During the two interviews, O.B. provided me with the following information:

    a.   In April 2021, she traveled to Austin, TX with a number of people for a car show. While there, she received a phone call or text instructing her to go to a hotel room to see something unusual. When she arrived, several people from the car show were already present, including RAHMAN, along with a woman she did not know, who had a very small live jaguar with her. (Later, I showed O.B. a photograph of MEYER, and she immediately identified MEYER as the woman who had the jaguar in the hotel room).

    b.   The people in the room were holding the jaguar and taking photos or videos with the jaguar. That hotel room was the first place where she photographed herself with the jaguar and took videos. She later posted those videos to her Instagram and TikTok accounts.

    c.   Although O.B. thought that the jaguar had been rented for an hour, she did hear RAHMAN talking to MEYER about purchasing the jaguar.

10

28.   O.B. later provided me with a video from her phone, dated April 17, 2021, depicting the jaguar cub on the floor of the hotel room. While reviewing the video, I could hear a man and a woman in the background discussing "payment." In that recorded conversation, the male says,

> "I mean is there any way I can let you know for sure tomorrow? Like, right when I get back, early in the morning … (pause) … and send you a wire?"

The woman replies,

> "Well, (unintelligible) tonight, for that cat."

29.   During her March 31 and April 11, 2022, interviews, O.B. also told me the following:

a.   She returned to California after the car show in Austin, TX and, a few weeks later, she saw the jaguar in California in the possession of RAHMAN.

b.   RAHMAN kept the jaguar cub at his house.

c.   She saw the jaguar several times at RAHMAN's house and took a number of photographs and videos with the jaguar that she posted to her Instagram and TikTok accounts.

d.   She posted the photos of herself with the jaguar one or two months after the photographs were actually taken.

e.   RAHMAN did not know how to take care of the jaguar and she gave him advice about how to care for and feed the jaguar.

f.   RAHMAN quickly became dissatisfied and wanted to get rid of the jaguar by selling it to someone else but was concerned that he would lose money in the transaction.

g.   It was her understanding that a person named "RXXXX" (later identified as R.A. of Riverside, CA ) was helping RAHMAN find a buyer for the jaguar and that it was R.A. who eventually connected RAHMAN to H.G., who bought the jaguar from RAHMAN.

h.   When she was with RAHMAN, the names "RXXXX" (R.A.) and "HXXXXX" (H.G.) would come up in conversations about selling the jaguar.

30.   She confirmed that she had seen the same jaguar at H.G.'s house in Riverside, CA, after RAHMAN sold the jaguar and no longer had it in his possession.

31.   In July 2022, I obtained guest records from the Hyatt Regency Hotel in Austin, TX, and confirmed that RAHMAN and O.B. were separately registered as guests at the hotel between April 16 and April 18, 2021.

32.   On March 24 and July 12, 2022, I interviewed R.A., who is a resident of Riverside, CA. Also present during these interviews was CDFW WO Austin Smith. During the interviews, R.A. provided us with the following information:

a.   RAHMAN originally purchased a live jaguar cub from a woman named "Mimi" in Texas and later sold it to H.G.

b.   After RAHMAN purchased the jaguar cub from "Mimi" (MEYER) in Texas, he paid her an additional $1,000 to have the jaguar delivered to him in California. R.A. did not know how much RAHMAN paid MEYER for the cub.

12

      c.    R.A. knew of a woman named "OXXXX" and believed that she was living with RAHMAN at the time RAHMAN owned the jaguar.

      d.    RAHMAN only owned the jaguar for one or two months before he decided to sell it to H.G.

      e.    H.G. told R.A. that he paid RAHMAN approximately $20,000 for the jaguar cub.

      f.    After RAHMAN sold the jaguar cub to H.G., R.A. continued to see the jaguar at H.G.'s house at 1XXX2 Lakepointe Drive.

      g.    R.A. noted that H.G. lived in the house with his wife/girlfriend, who was pregnant and soon to give birth. R.A. said that he had concerns about having a juvenile jaguar and a newborn infant in the same house. R.A. said that he eventually convinced H.G. to let him take the jaguar to a wildlife rescue center.

      h.    R.A. admitted that on the night of September 17, 2021, he and his roommate, H.L., put the live jaguar in a large dog kennel and drove it to Lions, Tigers, and Bears where they dropped it at the entrance to the facility after business hours (approximately 9:50 p.m.).

33.   I have identified two Instagram accounts belonging to MEYER of Houston, TX. One uses the name "mimisexoticworld" and the other uses the name "mimiseroticworld." Both Instagram pages have featured photos and videos depicting MEYER holding a live jaguar cub. I later showed some of those photographs and video frames to Dr. Mathias Tobler at the San Diego Zoo and he

confirmed that the jaguar cub in the photos and videos from MEYER's Instagram pages is the same jaguar depicted in photos from O.B.'s Instagram and TikTok account, from A.G.'s Instagram account, and is the same jaguar currently in the custody of Lions, Tigers, and Bears. (See Exhibit 2, attached to this affidavit for three images from MEYER's Instagram pages).

34. On July 12, 2022, WO Smith and I interviewed a witness named T.A. During that interview, T.A. told us the following:

a. He knows that RAHMAN purchased a live jaguar cub from MEYER, had it sent to California where he kept it for a short time, and later sold it to H.G.

b. He described RAHMAN as his friend and that RAHMAN had expressed interest in owning exotic animals, including a jaguar, for some time prior to April 2021.

c. He described a previous transaction between MEYER and RAHMAN that he believes contributed to RAHMAN purchasing the jaguar from MEYER in April 2021. Sometime in 2020, RAHMAN purchased a live marmoset primate from MEYER and planned to drive to Houston, Texas to personally pick up the marmoset from MEYER. However, RAHMAN and MEYER agreed to compromise and complete the transfer of the marmoset in Las Vegas, NV. MEYER agreed to have the marmoset sent to Las Vegas and delivered to RAHMAN for an additional fee. T.A. accompanied RAHMAN to Las Vegas where an unknown driver met them and gave RAHMAN a live marmoset in a small mesh bag. T.A. described the marmoset as "crazy" and RAHMAN was upset because it didn't appear that the marmoset was a baby, which is what RAHMAN wanted and paid for.

The marmoset was so difficult to care for that they looked for an exotic animal dealer in Las Vegas and ultimately found a pet shop that sold other marmosets. They asked the owner to temporarily take care of the marmoset for them and then they never went back, effectively abandoning the marmoset in Las Vegas. Because RAHMAN was dissatisfied, he asked MEYER for his money to be returned but, instead, she offered to give him a credit of $5,000 toward a future purchase.

      d.   After that failed transaction involving the marmoset, RAHMAN started talking about applying the $5,000 credit toward the purchase of a live jaguar cub from MEYER.

      e.   T.A. was present at the Hyatt Regency Hotel in Austin, TX on April 17, 2021, and he traveled from Southern California to Austin, TX with a group of people including O.B. and RAHMAN. (I have confirmed that T.A. was a registered guest at the Hyatt Regency Hotel in Austin, TX between April 15 and 18, 2021).

      f.   On April 17, 2021, while at the Hyatt Regency Hotel, T.A. received a phone call or text message from RAHMAN instructing him to come to RAHMAN's room in the hotel because "the jaguar is here." When T.A. arrived at RAHMAN's room, he observed that RAHMAN was on the bed holding and petting a very young jaguar cub. O.B. was also present in the room along with a woman whom T.A. identified as MEYER. (T.A. identified MEYER from a photographic lineup "six pack" I showed to him during the interview).

g.   T.A. did not stay in RAHMAN's hotel room long because, shortly after he arrived, the jaguar cub appeared to become very sick and started "splatter pooping everywhere." T.A. quickly left the room when that happened.

h.   At the conclusion of the weekend, T.A. returned to California and, shortly thereafter, heard that the jaguar was "paid for." T.A.'s understanding was that the price of the jaguar was $30,000 but, after the $5,000 credit, RAHMAN paid MEYER another $25,000 for the jaguar. T.A. does not know how the money was exchanged.

i.   T.A. repeatedly warned RAHMAN that purchasing the jaguar was illegal and advised him not to do it but, a short time later, RAHMAN instructed him to come to his house in Murrieta, CA to see the jaguar.

j.   T.A. was aware that RAHMAN paid MEYER an additional fee to have the jaguar delivered to him in California from Texas.

k.   RAHMAN found it difficult to care for the jaguar and quickly decided that he wanted to find a buyer and sell it. T.A. recalled that RAHMAN was concerned about losing money on the sale.

l.   An individual named R.A. introduced RAHMAN to H.G. for the purpose of H.G. purchasing the jaguar from RAHMAN.

m.   H.G. paid RAHMAN between $15,000 and $20,000 for the jaguar. T.A. said that RAHMAN told him that he lost $8,000 on the sale to H.G., so T.A. estimates that the price paid by H.G. was approximately $17,000.

35.    T.A. later provided WO Smith and me with videos and photographs of RAHMAN holding a live jaguar cub and text messages between himself and RAHMAN discussing the jaguar.

36.    On August 24, 2022, I interviewed RAHMAN by telephone. He confirmed his identity by disclosing his date of birth and Social Security Number. During the call, RAHMAN admitted that he purchased a live jaguar cub from MEYER in approximately May 2021.

37.    RAHMAN confirmed through the interview that he paid MEYER $25,000 for a live jaguar she referred to as Amador and that RAHMAN later named Hades. RAHMAN told me that the price was $30,000 but MEYER applied a $5,000 "credit."

38.    Immediately following the phone interview with RAHMAN, RAHMAN sent me a series of screenshots depicting text messages between himself and a person he knew as "Mimi" (MEYER) that occurred between approximately April 16 and May 4, 2021. I have reviewed the text messages and learned the following information:

    a.    In the text message exchanges between MEYER and RAHMAN, MEYER requested that RAHMAN make payments through a variety of methods including Zelle, CashApp, and Apple Pay, which are phone application-based cash transfer services, and through direct bank transfers. MEYER also directed RAHMAN to make various payments to her adult children, C.W. and S.M.

    b.    MEYER and RAHMAN discussed the law and the possible penalties associated with selling and transporting the live jaguar from Texas to California.

17

c.    MEYER and RAHMAN discussed the delivery of the live jaguar from Texas to California and MEYER initially referred to the delivery as "too risky," suggesting that they "… not text about it," and noted that "[w]e both shouldn't be walking around with all these texts." MEYER asked RAHMAN to delete all of their texts regarding the jaguar and told him that she had deleted the texts from her phone.

d.    On May 4, 2021, MEYER and RAHMAN exchanged texts about the imminent arrival of the jaguar cub. MEYER advised RAHMAN that, "[w]hen he [the transporter] arrives, just accept … please don't talk don't ask questions." MEYER also cautioned RAHMAN by texting, "Don't let everyone know about him [the jaguar] please."

39.    I am also aware that on May 28, 2021, MEYER sent a text message to RAHMAN expressing concern that images of the jaguar in California were being posted on the Internet or phone-based applications. MEYER texted an image of a jaguar cub from her phone to RAHMAN that appeared to depict what she was seeing on a cell phone app such as TikTok or Instagram. Along with those photos, MEYER texted, "Posting from Maywood, California & Los Angles (sic). No bueno trust me get a handle on that." MEYER continued in the same text, "If I got word of it here. That means others are seeing that & will snitch and they will be trying to track him down."

40.    On August 24, 2022, RAHMAN identified MEYER from a photo lineup "six pack" as "Mimi," the woman who sold him the live jaguar.

41. During my investigation, Dr. Mathias Tobler, at the San Diego Zoo, has used spot and whisker patterns depicted in photographs to identify the jaguar currently in the custody of Lions, Tigers, and Bears as the same jaguar depicted in photographs from the Instagram and/or TikTok accounts belonging to MEYER, O.B., and A.G. The photos and videos from MEYER's accounts often depict her posing with the jaguar cub. Dr. Tobler's comparisons also identified the jaguar at Lions, Tigers, and Bears as the same jaguar depicted separately in photographs alongside H.G. and RAHMAN.

## VI.  CONCLUSION

42. For all the reasons described above, there is probable cause to believe that Trisha Denise MEYER, has committed the following wildlife trafficking offenses: (1) interstate transportation of an endangered species in the course of commercial activity, a Class A misdemeanor, in violation of 16 U.S.C. §§ 1538(a)(1)(E), 1540(b)(1) and 18 U.S.C. § 2(b); (2) interstate sale of an endangered species, a Class A misdemeanor, in violation of 16 U.S.C. §§ 1538(a)(1)(F) and 1540(b)(1); and (3) trafficking prohibited wildlife species, a felony, in violation of 16 U.S.C. §§ 1538(a)(1)(E), (F), 3372(a)(2)(C), 3373(d)(1)(B), and 18 U.S.C. § 2(b).

43. For all the reasons described above, there is probable cause to believe that Abdul RAHMAN has committed the following wildlife trafficking offenses: (1) interstate transportation of an endangered species in the course of commercial activity, a Class A misdemeanor, in violation of 16 U.S.C. §§ 1538(a)(1)(E),

19

1540(b)(1) and 18 U.S.C. § 2(b); and (2) trafficking prohibited

wildlife species, a felony, in violation of 16 U.S.C. §§

1538(a)(1)(E), (F), 3372(a)(2)(C), 3373(d)(1)(B), and 18 U.S.C.

§ 2(b).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _15th_ day of
September, 2022.


_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

20

**EXHIBIT 1**

Photograph of abandoned jaguar.



## **EXHIBIT 2**

Screenshots from Trisha MEYER Instagram accounts.




